EMMA LEAH FISHBECK v. STATE.

No. 24351. June 15, 1949.
Rehearing Denied January 18, 1950.
Request for Leave to File Second Motion for Rehearing Denied
(Without Written Opinion) January 25, 1950.

188

BEAUCHAMP, Judge, dissenting.

P. P. *Putney* and J. W. *Ragsdale* (deceased) both of Victoria, and B. D. *Tarlton*, of Corpus Christi, for appellant.

*Ernest S. Goens*, State's Attorney, Austin, for the state.

GRAVES, Judge.

Appellant was charged by indictment with the unlawful killing of Jacob John Fishbeck, her husband; and upon her conviction, she was awarded a penalty of ten years in the penitentiary, and she appeals.

It was shown by the state's testimony that the deceased and some of his friends spent a portion of the night previous to his death in a coon hunt in the field of a neighbor; that a case of beer was consumed by such hunters; but they caught no coons; that deceased agreed at such time that on the following Wednesday, he would procure some good dogs and they would again take this hunt; that these friends repaired to their respective homes at an early morning hour, the deceased appearing to be in his usual good humor, pleasant and jovial when observed by his friends on that night. The party left the hunt at about 1:30 o'clock in the morning. The deceased got out of a neighbor's car at his yard gate, and they left for their several homes, evidently seeming to be happy and in good spirits. This was on the night of June 8th, or the morning of June 9, 1945.

M. L. Edwards and his wife, Bessie Edwards, in June, 1945, lived about a quarter of a mile from the Fishbeck home. In the

early morning of June 9, 1945, at about 4:00 o'clock, appellant appeared at the Edwards home. She was evidently disturbed and was crying. Both of the Edwards arose and dressed and talked to appellant, who had on an ordinary clean print dress such as housewives usually wear around the house. She manifested grief by her conduct. The Edwards people went with her to the Fishbeck home, and in the dining room, they found evidence of someone having recently eaten therein, and a soiled empty plate, and a knife and fork. The sheriff of the county soon appeared. He and Mr. Edwards entered the north bedroom and there found Mr. Fishbeck, who was dead. There was a wound over the right eye and a good-sized hole, and part of the head was gone. He was lying on his back on the floor with his head on a bloody pillow. A shotgun was lying straight up and down on his body, and his hands were on the barrel thereof. There were portions of his body, or brains, on the wall of the house near the bed.

Appellant told them that she and the deceased were in bed together; that she was asleep and was awakened by the shot; that she saw the deceased partly on the bed and with his feet on the floor; that she eased him to the floor and placed a pillow under his head. She said that the deceased had killed himself. She then came to the Edwards' home for help. When they came to the appellant's home, Alvin, the youngest child of appellant and deceased, came walking out of the room.

Appellant's statement placed her in bed by the deceased, and between him and the wall on which the blood was found. No blood was discernible on appellant's clothing which were clean.

On June 9, 1945, an inquest was held over Mr. Fishbeck's body in which there was a finding that Jacob Fishbeck came to his death at the hands of Emma Fishbeck. However, such finding being deemed inconclusive and incomplete, on February 12, 1947, the Justice of the Peace of Precinct No. 1 of Victoria County, ordered the disinterment and re-examination of the body of the deceased. Such disinterment was carried out, and deceased's body was found in a mummified condition with a rubber bag containing fragments of bones in the grave. These fragments, together with the skull, were used in reassembling the bony structure of the skull, and were the subject of certain testimony of experts from the department of public safety. It was demonstrated that the deceased had been shot from the upper right portion of his head, ranging downward, a number of the leaden pellets still being found in the undestroyed part of the skull, and fragments of shot being found in the deceased's

right arm, and some 15 or 16 small holes in this arm, such pellets being present in court.

The experts dissected such pellets from the arm, they coming out as fragments as if they had previously passed through some hard substance. These were located just above the wrist extending up about two and one-half inches from the heel of the hand towards the elbow, on the inside of the arm on the palm side. There were no powder burns on the arm, and no wadding was found in the mass taken from the skull. In the opinion of the witness, powder burns would show when fired in such a gun as the one in question up to a distance of three feet, also the shot load would be followed with wadding, none of which were found in this body. It was the opinion of the expert that the deceased had been shot from above his head in a downward direction, and that his right arm, palm up, was lying on the right side of his head, the shot having been fired at no closer distance than three feet away. The witness based his testimony upon the fragments found in the deceased's grave and the skull, which he had reconstructed, a picture of which was introduced in evidence and such reconstructed skull was present in evidence and shown to the jury.

Appellant presents 21 bills of exception which can be grouped into separate classes. The first group relates to the voir dire examination of the jury. It was conceded that this case was one of circumstantial evidence, and in questioning Mr. Marthiljohni, he was thus interrogated:

"Mr. Marthiljohni, you said you had no prejudice against circumstantial evidence. In other words, there will be no positive proof that this defendant shot or killed her husband but they (meaning the State) will rely on a bunch of circumstances to prove that fact. Now, then, I will ask you this: 'If, from all of these facts and circumstances, you reach the conclusion that possibly she is the one that did do the killing, and from the same set of facts you would reach the view that probably she did do the killing, would you convict on those circumstances on circumstantial evidence?' "

The venireman answered:

"Yes, sir, I guess I would."

"The defendant challenged for cause and the Court overruled the challenge and the juror being objectionable to the defendant, by reason of the answer he made to the question as shown,

exercised a *pre-emptory* challenge as against such venireman and he was excused by reason of such challenge."

This bill is qualified in part as follows:

"Before passing on the challenge of the Defendant to the venireman mentioned in said bill, the court stated to defense counsel that he thought the law concerning circumstantial evidence should be more fully explained to the juror, and the matter gone into a bit further to determine that the juror fully understood the question and his answer thereto. Counsel for defendant declined to do so, but insisted on an immediate ruling to his challenge. The Court again stated that in his opinion the matter had not been gone into sufficiently to determine that the juror was subject to challenge for cause, and again suggested that counsel pursue the subject further. Counsel for defendant declining to do this, or to seek from the venireman an answer explaining his meaning in answering the question as he did, but still insisting that the court rule on his challenge based on the single question and answer contained in the bill of exceptions, the court overruled defendant's challenge for cause."

The same proposition occurs in Bill No. 2 relative to Venireman, Wayne Houston, with the same answers and the same qualification; and again, the same proposition is presented by Bill No. 3.

We are of the opinion that the challenge to such jurors should have awaited an explanation to such jurors of the law of circumstantial evidence, and was prematurely made and should also have awaited further questioning by the court, which further questioning was had as shown by the qualification.

Bill No. 4 arose because of appellant having failed to have her challenge for cause sustained by reason of the trial court's action in Bill Nos. 1, 2 and 3. She was compelled to peremptorily challenge such three jurors and finally exhausted all her peremptory challenges and was finally compelled to take one, Ray Marshall, an objectionable juror, because of the fact that she had exhausted all her such challenges. We think under the circumstances here present, appellant's attorney, by his premature action herein, himself, created such situation and cannot now be heard to complain of such result.

Bill No. 5 does not impress us with any probable error.

Bill No. 6 is an objection to the failure of the court to allow

a lay witness to testify relative to matters that were within the realm of expert evidence; and again, we do not think such question had sufficient materiality to have exercised any bearing on the case.

Bill No. 7 complains of the introduction of the order of the Justice of the Peace of Precinct No. 1 of Victoria County, issued on February 12, 1947, ordering the disinterment of deceased's body for the purpose of holding an inquest and to determine whether he came to his death by his own hand or by that of another. It is shown that twenty-two months prior thereto, an inquest had been held, and therein it was stated that deceased came to his death by means of a gunshot wound from the hands of the appellant. Thereafter, the justice of the peace certified that such first inquest "was incomplete and inconclusive, * * * (and that the position and direction of the gunshot wounds on the body of said deceased are of material importance in determining if the deceased met his death through unlawful means)," it is therefore ordered that the body be disinterred, etc. The portion of such order in parenthesis, while being contained in the order, was not read to the jury.

There are many objections to the introduction of such last-named order, all of which objections went to the final detailing of the finding resulting from the inspection of the deceased's body. Under Articles 969 and 972, Vernon's Ann. C. C. P., we believe the justice of the peace could act upon information given by any credible person, or upon facts within his own knowledge. It is noted that although the inquest of 1945 gave as the cause of death of deceased, a gunshot wound inflicted by appellant, evidently such a report was not satisfactory at least to the grand jury, as the indictment herein returned was filed May 27, 1947, nearly two years after his death, and we are inclined to the belief that an inquest could be had for the purpose of completing this inconclusive and incomplete first inquest. It seems that the sheriff and the county attorney had both requested such order, and after talking with them and examining the prior inquest thereof, the justice of the peace decided to issue this last order. Whereupon, the trial court admitted the testimony of witnesses relative to what was disclosed in the inquest held after such disinterment. We are of the opinion that such testimony was proper herein.

Bill No. 8 relates to a question answered by the firearms expert relative to the condition of the pellets and portions thereof found in the deceased's arm, as to whether such condition could have been caused by first passing through the bones of the de-

ceased's head. He merely stated that such was very possible, and under the evidence, we can see no error evidenced thereby. To the same effect was a further objection made to the downward slope of the evidenced wound upon the head of the deceased, as shown by Bill No. 9, by the same expert, and we think the answer thereto was permissible.

Bill of Exception No. 10 relates to a question propounded to an expert witness on firearms relative to whether or not a gun fired into one's head by a person at a distance of three feet would leave visible powder burns. The witness answered as to what his opinion was relative to such a situation, and having qualified as an expert on such matters, we think same was admissible. See Murphy v. State, 149 Tex. Cr. R. 624, 198 S. W. (2d) 98.

Relative to Bill No. 11, the court's qualification thereto shows no objection was made to the testimony set forth in said bill, and such bill is therefore overruled.

Bill No. 12 is concerned with an objection to an X-ray expert holding in his hand while on the witness stand and exhibiting in the presence of the jury an X-ray picture of the deceased's right arm on the ground that the deceased's right arm itself was in the courthouse at such time, and was the best evidence relative thereto. While such may have been true, nevertheless, the presence of leaden pellets in such arm could only be shown by means of such X-ray picture, and we see no harm resulting from the witness holding such picture in his hand while testifying before the jury therefrom.

Bill No. 13 relates to a request upon the the part of appellant's attorney to be allowed to take the shotgun in evidence, being allegedly the one causing deceased's death, from the courtroom and making certain experiments therewith. This request was granted by the court with one proviso, and that was that the sheriff should accompany such gun and same be in his custody while appellant's attorney could make any experiment therewith that he saw fit. Appellant's attorney made the objection to such proviso that he did not want Bill Crawford (the sheriff) or anyone else to see what he was doing, and refused to accept such condition, but excepted to the action of the court in attaching such proviso thereto. It is shown that the gun in question was in evidence and in the custody of the court, and we think the court was correct in maintaining his custody and control of this piece of evidence during the trial.

Bill No. 14 relates to a question propounded to the expert relative to whether or not the order of the justice of the peace in regard to the disinterment of Mr. Fishbeck's body authorized such expert "to cut this man's head off from the rest of his body." The state objected to this question on the ground that the order itself was in evidence and spoke for itself, and the expert was acting under the orders of the sheriff, and the question had no materiality to the matter at issue. If the witness had been allowed to answer, he would have testified that he was acting under the instructions of the sheriff of that county, and that he did not know whether there was anything in such order authorizing such act or not.

Bill No. 15 objects to the same witness testifying that he believed he had the authority to remove the skull and the arm of the deceased in order to ascertain the cause and manner of the death of the deceased.

And again, in Bill No. 16, relative to the necessity of taking this skull and arm to the laboratory of the Department of Public Safety at Austin, we can see no error shown in such bill. If it was necessary to take such portions of the body of the deceased to a laboratory equipped for such examination, the purpose of the exhumation thereof could best be subserved under the order of such justice of the peace. It is evident herein that the justice of the peace was acting lawfully when he ordered such disinterment under Articles 968, 969, and 970, Vernon's Ann. C. C. P., and his act in so doing was an official act "to obtain evidence to prevent escape of the guilty, as well as to furnish foundation for criminal prosecution in case death is shown to be felonious." See Pierson v. Galveston County, (Texas Civ. App.) 131 S. W. (2d) 27; Aetna Life Insurance Co. v. Love, (Texas Civ. App.) 149 S. W. (2d) 1071. A determination of the necessity therefor usually rests within the sound discretion of the justice of the peace. The power to order a body to be disinterred carries with it the power to determine, if possible, the cause of death and by whom, if anyone, such death was caused; and if necessary, to perform an autopsy; proceedings necessary to such autopsy are authorized. Evidently a laboratory analysis could not be carried out at the graveside, and the organs of the body, as well as other portions thereof, had to be removed in order to effectuate the purpose of the exhumation. We overrule the bills relative to such acts on the part of the experts and officers.

Bill No. 17 is overruled; it relates to a certain statement made by the district attorney in argument which was a con-

clusion drawn from the testimony; and to the same effect is our ruling in Bill No. 18 relative to how the evidence impressed the district attorney as to the manner in which the deceased met his death.

Bill No. 19 emphasizes the fact that in a res gestae statement appellant told Mr. and Mrs. Edwards that the deceased had killed himself, and the appellant therefore asked for a peremptory instruction to the jury directing them to return a verdict of not guilty, the case being one depending on circumstantial evidence alone. This the trial court refused to do. It is noted in the court's charge (Paragraph 15) that the trial court told the jury that the state was bound by such statement unless such statement was proven to be untrue by other evidence beyond a reasonable doubt, and unless so shown, they should acquit appellant. We think this charge was correct, and we overrule Bills Nos. 19, 20, and 21.

This cause being one relying upon circumstantial evidence alone, under the charge and the law, the testimony herein must exclude every other reasonable hypothesis than appellant's guilt, and lead on the whole to a satisfactory conclusion and produce in effect a reasonable and moral certainty that the accused, and no other person, committed the offense charged; and unless they do so beyond a reasonable doubt, the jury were instructed to acquit the defendant.

According to the testimony herein, appellant's youngest child, a boy (Alvin) was present at the home when the deceased died; and appellant herself eliminates him as a suspect herein in the following statement to Mrs. Bessie Edwards soon after she had awakened them and made the statement that deceased had killed himself. Appellant told her, as the witness testified, that:

"The little boy was at the house when we got down there. I don't know his name. It is the youngest one. With reference to whether or not this defendant at that time made any statement with reference to Alvin Fishbeck at the time of the shooting or after: The only thing she asked him to go up to our house and he was scared; it was dark and he did not want to come. With reference to whether she said where he was at the time of the shooting: He was in bed asleep, that is what she told. She stated he was asleep in the boys' room, the south room I guess; anyway, the other bedroom from here. The defendant did tell us when he shot himself he was half on the bed and half on the floor and she pulled him from the bed to the floor and put a pillow under his head."

Under appellant's own testimony, only she and the deceased were present in the room when he met his death; and under the testimony of the state, unless the jury believed that he took his own life, one is led to the inescapable conclusion that Jacob Fishbeck came to his death by means of a gunshot wound at the hand of appellant, his wife.

We think the testimony is sufficient to thus show, and finding no error shown in the record, this judgment is accordingly affirmed.

### ON APPELLANT'S MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

The motion for rehearing is predicated largely upon the proposition that the evidence against appellant is circumstantial and that it does not produce a reasonable and moral certainty that appellant and no other person killed the deceased. This is the only proposition which will be considered. It will be recalled that the first report of the killing was made by appellant to her neighbors, the Edwardses, where she appeared about 4:00 o'clock in the morning and reported that deceased had shot himself. The facts revealed upon the disinterment and examination of deceased's body appear to establish without any doubt that the wound in deceased's head could not have been self-inflicted. No one was at the Fishbeck home save him, appellant and the 14-year-old son. Appellant's statement to the Edwardses excluded the son's guilt. She places him asleep in the adjoining room at the time of the shooting. The position of deceased's body on the floor between the beds, with his hands grasping the gun, in view of the character of the wound in the head, strongly suggests the arrangement of the body and gun after the wound was inflicted. Giving effect to appellant's statement that the son was asleep in the adjoining room at the time of the shooting leads to the conclusion that any adjustment of deceased's body and the gun was made by appellant and no other person.

Without going further into details, what we have said is sufficient to indicate our reasons for concluding that the motion for rehearing should be overruled, and it is so ordered.

BEAUCHAMP, Judge. I respectfully dissent.